**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| In re | ) Chapter 11 |
|  | ) |
| LE-NATURE'S, INC., *et al.*, | ) Case No. 06-25454 (MBM) |
|  | ) |
|  | ) Jointly Administered |
| Debtors. | ) |
|  | ) Hearing date:  June 12, 2008 at 1:30 p.m. |
|  | ) |

**THE PLAN PROPONENTS' COLLECTIVE**
**REPLY TO THE *OBJECTION OF WACHOVIA BANK,***
***NATIONAL ASSOCIATION TO CONFIRMATION OF THE***
***SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION***

Dated June 9, 2008

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ...........................................................................................................2

FACTS ........................................................................................................................4

POINTS ON REPLY .....................................................................................................5

A.    The Wachovia Plan Objection Should Be Overruled
      Because It Is Not Supported By The Facts Or The Law........................................5

      1.    Wachovia's Contention That The Plan
            Improperly Releases Its Rights Of Contractual
            Seniority Is Not Supported By The Facts Or The Law............................5

            a.    Wachovia Cannot Establish
                  Greater Entitlement To Contractual
                  Subordination Than What Is Provided For In The Plan .............6

                  i.    Wachovia Bears The Burden Of Proof ...........................6

                  ii.   Contrary To Wachovia's Protestations,
                        The Indenture Does Not Clearly Provide Wachovia
                        A Greater Entitlement To Contractual Subordination ....................7

                        (1)   Section 10.2 Does Not
                              Support Wachovia's Argument
                              Because, Pursuant To The Indenture,
                              Lender Debt Simply May Not Enjoy
                              The Benefits Of Full Contractual Subordination ................8

                        (2)   Section 10.3 Also Does Not Support
                              Wachovia's Argument Because Section 10.3
                              Is Not A Subordination Provision And, Even
                              If It Is, The Triggering Default Has Been Waived ...........10

                              (A)   Section 10.3 Is Not A
                                    Subordination Provision.........................................10

                              (B)   Assuming Section 10.3 Is A
                                    Subordination Provision (Which It Is Not),
                                    The Triggering Default Has Been Waived ...........12

i

   b. Wachovia Cannot Prohibit The
    Lenders From Effectuating The
    Contractual Subordination Settlement By
    Amendment To The Pre-Petition Secured Credit Agreement ...................13

   c. The Lender's Overwhelming
    Vote In Favor Of The Plan Binds
    Wachovia, As A Member Of The Lender Class ........................................15

  2. Wachovia's Contention That The
   Plan Fails The "Best Interests" Test Is
   Not Supported By The Facts Or The Law ............................................16

  3. Wachovia's Contention That The Plan
   Unfairly Discriminates Against Its Claims
   Is Not Supported By The Facts Or The Law .........................................19

  4. Wachovia's Contention That The Plan
   Has Not Been Proposed In Good Faith
   Is Not Supported By The Facts Or The Law .........................................21

  5. Wachovia's Contention That
   The Plan Is Not "Feasible" Is Not
   Supported By The Facts Or The Law ..................................................22

  6. Wachovia's Contention That
   The Plan Improperly Provides
   For Substantive Consolidation Is
   Not Supported By The Facts Or The Law ............................................25

B. Wachovia's Meaningless Discovery
 Dispute Does Not Form A Legitimate
 Basis To Deny Confirmation Of The Plan.......................................................26

C. Wachovia's Allegation Of Faulty Solicitation
 Process Is Neither Factually Accurate Nor A
 Legitimate Basis To Deny Confirmation Of The Plan ....................................28

D. The Court Should Dismiss The Wachovia Plan
 Objection As Nothing More Than A Litigation Ploy
 To Obstruct Funding For Estate Litigation Against Wachovia .........................30

CONCLUSION.................................................................................................32

**Page (s)**

**Federal Cases**

Bartle v. Markson Bros.,
    314 F.2d 303 (2d Cir. 1963) ..................................................................................... 15

Beanstalk Group, Inc. v. AM Gen. Corp.,
    283 F.3d 856 (7th Cir. 2002) ........................................................................... 11, 14

Berkley Fed. Bank & Trust v. Sea Gardens Motel & Apts. (In re Sea Garden Motel &
    Apartments), 195 B.R. 294 (D.N.J. 1996).......................................................................23

Bustop Shelters v. Classic Homes, Inc.,
    914 F.2d 810 (6th Cir. 1990) ..................................................................................... 19

Chemical Bank v. First Trust of N. Y. (In re Southeast Banking Corp.),
    156 F.3d 1114 (11th Cir. 1998) ................................................................................. 11

Enron Corp. v. New Power Co. (In re New Power Co.),
    438 F.3d 1113 (11th Cir. 2006) ................................................................................. 19

Heller Financial v. Prudential Ins. Co. of Am.,
    371 F.3d 944 (7th Cir. 2004) ..................................................................................... 10

Hunt Energy Co., Inc. v. U.S. (In re Hunt Energy Co., Inc.),
    48 B.R. 472 (Bankr. N.D. Ohio 1985) ...................................................................... 10

In re 47th and Belleview Partners,
    95 B.R. 117 (Bankr. W.D. Mo. 1988)........................................................................ 24

In re Abbotts Dairies of Pa., Inc.,
    788 F.2d 143 (3d Cir. 1986)........................................................................21

In re Am. Family Enters.,
    256 B.R. 377 (D.N.J. 2000) ....................................................................................... 23

In re Applied Safety, Inc.,
    200 B.R. 576 (Bankr. E.D. Pa. 1996) .................................................................. 18, 24

In re Best Prods.,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) .......................................................................... 7

In re Enron Creditors Recovery Corp.,
   370 B.R. 64 (Bankr. S.D.N.Y. 2007) ........................................................................ 7

In re Heritage Organization, L.L.C.,
   375 B.R. 230 (Bankr. N.D. Tex. 2007) ....................................................... 24, 25, 30

In re Holly's, Inc.,
   140 B.R. 643 (Bankr. W.D. Mich. 1992) ................................................................ 10

In re Lakeside Global II, Ltd.,
   116 B.R. 499 (Bankr. S.D. Tex. 1989) .................................................................... 23

In re Machne Menachem, Inc.,
   371 B.R. 63 (Bankr. E.D. Pa. 2006) ....................................................................... 24

In re Mayer Pollock Steel Corporation,
   174 B.R. 414 (Bankr. E.D. Pa. 1994) ..................................................................... 23

In re Owens Corning,
   419 F.3d 195 (3d Cir. 2005) .................................................................................... 26

In re Orfa Corp. of Philadelphia,
   129 B.R. 410 (Bankr. E.D. Pa. 1999)…………………..…………………………………………23

In re Paolini,
   312 B.R. 295 (Bankr. E.D. Va. 2004) ..................................................................... 19

In re PWS Holding Corp.,
   228 F.3d 224 (3d Cir. 2000) .................................................................................... 21

In re Smith,
   77  B.R. 624 (Bankr. N.D. Ohio 1987) ................................................................... 11

In re T-H New Orleans L.P.,
   116 F.3d 790 (5th Cir. 1997) ................................................................................... 25

In re Walnut Equipment Leasing Co., Inc.,
   1999 Bankr. LEXIS 1460 (Bankr. E.D. Pa Nov. 23, 1999) ...................................... 7

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),
   478 F.3d 452 (2d Cir. 2007) .................................................................................... 30

**Federal Statutes**

11 U.S.C. § 1123(a)(4) .............................................................................................. 18

11 U.S.C. § 1126 .................................................................................................. 14, 15

11 U.S.C. § 1126(c) .................................................................................................. 14

11 U.S.C. § 1129(a)(11) ............................................................................................ 22

11 U.S.C. 1129(a)(3) ................................................................................................. 20

11 U.S.C. 1129(a)(7) ................................................................................................. 15

## **Miscellaneous**

4 COLLIER ON BANKRUPTCY, ¶ 510.03[4] (15th ed. rev. 2008) .......................................14

7 COLLIER ON BANKRUPTCY, ¶ 1129.03[7][c][v] (15th ed. rev. 2008) ...................... 14-15

Sally McDonald Henry, ORDIN ON CONTESTING CONFIRMATION
    § 6.11[b] (3d ED. Aspen 2004) ...............................................................................15

H.R. Rep. No. 95-595 (1977) ..................................................................................... 14

S. Rep. No. 95-989 (1978) ......................................................................................... 14

This Reply to *The Objection Of Wachovia Bank, National Association To Confirmation Of The Second Amended Joint Chapter 11 Plan Of Liquidation*, dated June 5, 2008 [Docket Number 2083] (the "Wachovia Plan Objection" or the "Objection") is jointly and respectfully submitted by: (1) R. Todd Neilson, the duly appointed Chapter 11 Trustee (the "Chapter 11 Trustee") of Le-Nature's, Inc. and affiliated Chapter 11 debtors (collectively, the "Debtors");[1] (2) the Official Committee of Unsecured Creditors duly appointed in the Debtors' Chapter 11 cases (the "Official Creditors' Committee"); (3) the *Ad Hoc* Committee of Secured Lenders (the "*Ad Hoc* Lenders' Committee"), of institutions collectively owed approximately 62% of the $278 million borrowed under the Debtors' pre-petition secured credit agreement (the "Pre-Petition Secured Credit Agreement"), as well as approximately 48% of the $150 million outstanding amount of the Debtors' unsecured bonds (the "Senior Subordinated Notes"); and (4) the *Ad Hoc* Committee of Senior Subordinated Noteholders (the "*Ad Hoc* Noteholders' Committee" and, together with the Chapter 11 Trustee, the Official Creditors' Committee and the *Ad Hoc* Lenders' Committee, the "Plan Proponents"), of institutions collectively holding approximately 1.5% of outstanding indebtedness under the Pre-Petition Secured Credit Agreement, approximately 49.4% of the Senior Subordinated Notes, and approximately $45.85 million in general unsecured claims.

---

[1]     On June 3, 2008, the Chapter 11 Trustee filed the *Chapter 11 Trustee's Joinder In Second Amended Joint Chapter 11 Plan Of Liquidation Of The Official Committee Of Unsecured Creditors, The Ad Hoc Committee Of Secured Lenders, And The Ad Hoc Committee Of Senior Subordinated Noteholders* [Docket No. 2070], thereby formally joining in the Plan and the other Plan Proponents' request that it be confirmed by Order of this Court.

## <u>INTRODUCTION</u>

1.      The Wachovia Plan Objection largely recycles the same arguments that the Court has heard and properly rejected many times before.   Once again, Wachovia Bank, National Association ("<u>Wachovia</u>") complains that the Plan: (a) releases contractual subordination rights that Wachovia simply does not have; (b) fails the "best interests" test, in the face of a mountain of evidence clearly establishing otherwise; (c) discriminates against Wachovia regardless of the fact that, if its claims are ultimately sustained, it will receive substantially better treatment than *any* other creditor in the case; (d) is not proposed in "good faith," without one iota of factual evidence to support the contention; (e) is not "feasible," basing such argument on a clear misunderstanding of the Plan and the law; and (f) wrongfully provides for the substantive consolidation of the Debtors' estates, even though Wachovia will not incur any economic impact by such consolidation and even though the facts of the case (a massive corporate fraud involving "doctored" books and records) would otherwise support it.

2.      The Plan Proponents have produced in discovery thousands of pages of documents; but, not a single page supports Wachovia's arguments, as is proven by the absence of any meaningful documents attached to the Wachovia Plan Objection.  Wachovia demanded that no fewer than **<u>eight</u>** individuals appear at its counsel's office, each for a full day's deposition; but, after taking **<u>only four</u>** depositions, it voluntarily decided to cancel all remaining depositions, presumably because the testimony already given was not helping its case and it was beginning to see a pattern.  Wachovia has further conceded: (1) it will not be producing a single witness at the confirmation hearing in support of the Wachovia Plan Objection; (2) it will not be calling any adverse witnesses at the confirmation hearing; and (3) it will not be introducing any expert testimony attesting to any of its case theories.  The Wachovia Plan Objection is supported by nothing.

3.      As a feeble "last ditch" defense, Wachovia manufactures meaningless discovery disputes and contends that the Plan Proponents' solicitation efforts were faulty.  As discussed herein, these arguments are utterly frivolous.

4.      By now it must be abundantly clear to the Court and to all parties-in-interest that Wachovia did not file its Objection out of actual, heart-felt concern for its own rightful recovery from these bankruptcy estates.  Holding approximately $23 million in debt; that is a "small money" issue for Wachovia.  As this Court has been informed many times, Wachovia is the primary target for estate litigation and the Plan provides for an efficient marshalling of estate resources and the creation of a deep "war chest" to fund such litigation.  The prospect of being adjudged liable to the estates for perhaps hundreds of millions of dollars is the "big money" issue for Wachovia.  Indeed, Wachovia has long fought case progress, laboring to create delay, obfuscate the facts, and create in-fighting among creditor constituencies.  It has pressed tirelessly for Chapter 7 conversion, obviously because it blanches at the prospect of millions of dollars being made available to fund estate litigation against it.  Creditors and interest holders have voted <u>overwhelmingly</u> in favor of the Plan and the litigation mechanic that it contemplates; they have waited far too long for the day of reckoning.

5.      In sum, the Plan is perfectly legal and appropriate, and is supported by the evidence, the estates' two fiduciaries (the Chapter 11 Trustee and Official Creditors' Committee), and -- importantly -- virtually all creditors.  The Wachovia Plan Objection does not interpose a single legitimate, legally sustainable reason to deny confirmation.  It should be overruled.

# FACTS

6.      Substantially contemporaneous with the filing of this Reply, the Plan Proponents have filed the *Memorandum Of Law In Support Of Confirmation Of The Second Amended Joint Chapter 11 Plan Of Liquidation, Jointly And Respectfully Submitted By: (1) R. Todd Neilson, Chapter 11 Trustee; (2) The Official Committee Of Unsecured Creditors; (3) The Ad Hoc Committee Of Secured Lenders; And (4) The Ad Hoc Committee Of Senior Subordinated Noteholders* (the "Plan Proponents' Confirmation Memorandum of Law").     The Plan Proponents' Confirmation Memorandum of Law includes a lengthy recitation of relevant case facts, which recitation is incorporated herein by reference.[2]

7.      Furthermore, substantially contemporaneous with the filing of this Reply and the Plan Proponents' Confirmation Memorandum of Law, the Plan Proponents have also caused to be filed the *Declaration of Louis A. DePaul, Esq.*, dated June 9, 2008 (the "DePaul Dec."), attached to which are true and correct copies of certain pleadings and all other evidentiary documents referred to in this Reply.  For the Court's convenience, relevant factual documents are identified herein by cross-citation to an Exhibit to the DePaul Dec.

---

[2]      Terms not otherwise defined herein shall have the meanings ascribed thereto in the Plan Proponents' Confirmation Memorandum of Law.

## POINTS ON REPLY

**A.   The Wachovia Plan Objection Should Be Overruled
Because It Is Not Supported By The Facts Or The Law.**[3]

    **1.   Wachovia's Contention That The Plan
Improperly Releases Its Rights Of Contractual
Seniority Is Not Supported By The Facts Or The Law.**

       8.   It is true that the Indenture for the Senior Subordinated Notes (<u>See</u> DePaul Dec. at Ex. 42) provides that such debt is contractually subordinated to "Senior Indebtedness," meaning that holders of the Senior Subordinated Notes may (in certain circumstances) be required to turnover estate distributions to holders of such "Senior Indebtedness." An incomplete and unsophisticated review of the Indenture may suggest that the Lenders under the Pre-Petition Secured Credit Agreement (<u>See</u> DePaul Dec. at Ex. 43) hold such "Senior Indebtedness" and, therefore, have an unqualified right to full contractual subordination. But, a more careful and thorough analysis of the Indenture indicates that the question is rather complex, and that the Lenders may not, in fact, enjoy the benefits of full contractual subordination.[4]

---

[3]    Because the Plan would effect a settlement of contested issues between Lenders and Senior Subordinated Noteholders, all parties must reserve all rights with respect to these contested issues, including the extent and enforceability of the contractual subordination rights discussed herein, should the Plan not be confirmed as requested.

[4]    A point Wachovia omits from the Objection is that the settlement of subordination issues embodied in the Plan was necessitated, in large part, by Wachovia's own actions. First, Wachovia was the original holder of the debt under the Pre-Petition Credit Agreement, and, because of Wachovia's involvement in the Debtors' financial collapse, other Lenders faced some risk that they, as subsequent holders of the debt, might face equitable subordination of their claims because of the "taint" left by Wachovia's original holding. Next, because Wachovia failed to properly amend the Indenture at the time it was amending the Pre-Petition Credit Agreement to allow the Debtors to borrow additional funds, ambiguity arguably existed as to the extent of subordination supported by the terms of the Indenture. Both factors figured prominently in the need to resolve the subordination issues by agreement rather than incur litigation risks on the matter.

9.      The Plan contemplates a Solomonic "split-the-baby" settlement of the issue, to wit: contractual subordination is fully enforced until the Lenders receive $110 million from the estates and, thereafter, Noteholder distributions are shared pursuant to a stipulated formula (the "Contractual Subordination Settlement").  With the sole exception of Wachovia, every single Lender voting on the Plan (collectively holding approximately two-thirds of the aggregate Lender debt) has voted to accept the Contractual Subordination Settlement.  As part of their Plan vote, two-thirds of the Lenders have also agreed to amend the Pre-Petition Secured Credit Agreement to otherwise effectuate the Contractual Subordination Settlement through that agreement.

10.     Therefore, in order to prevail on its objection to the Contractual Subordination Settlement and (by extension) the Plan, Wachovia must establish: (1) that Wachovia has a greater entitlement to contractual subordination than what is provided for in the Plan; (2) that the Lenders cannot effectuate the settlement by amendment to the Pre-Petition Secured Credit Agreement; and (3) that the Lenders' overwhelming vote in favor of the Plan does not, as a matter of law, otherwise bind Wachovia, even though it is a member of the same Class of creditors.  For the reasons discussed below, Wachovia cannot establish even one of these points, let alone all three.

**a.      Wachovia Cannot Establish
Greater Entitlement To Contractual
<u>Subordination Than What Is Provided For In The Plan</u>.**

**i.      <u>Wachovia Bears The Burden Of Proof</u>.**

11.     As a preliminary matter, Wachovia is just plain wrong when it argues that the Plan Proponents bear the burden of proof on this issue.  Not a single case cited in the Wachovia Plan Objection supports such proposition and, in fact, the argument runs counter to the

holding of several published opinions. See, e.g., In re Enron Creditors Recovery Corp., 370 B.R. 64, 72 (Bankr. S.D.N.Y. 2007) ("[T]he party seeking to benefit from the subordination provisions bears the burden of proof."), rev'd on other grounds, 380 B.R. 307 (S.D.N.Y. 2008); In re Walnut Equipment Leasing Co., Inc., 1999 Bankr. LEXIS 1460, at *15-19 (Bankr. E.D. Pa. Nov. 23, 1999); In re Best Prods., 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994) ("A contractual subordination agreement is simply a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another. The burden of proving the existence and validity of a contract rests squarely on the party seeking enforcement of that contract.").

12.     It is, to be certain, Wachovia's burden to prove entitlement to contractual subordination beyond what is provided for in the Plan.

> ii.     **Contrary To Wachovia's Protestations, The Indenture Does Not Clearly Provide Wachovia A Greater Entitlement To Contractual Subordination.**

13.     In its Objection, Wachovia roots its claim to full contractual subordination in two provisions of the Senior Subordinated Notes Indenture: (1) Indenture Section 10.2, which renders the Senior Subordinated Notes contractually subordinated to defined-term "Senior Indebtedness"; and (2) Indenture Section 10.3, which (according to Wachovia's interpretation, discussed below) renders the Senior Subordinated Notes contractually subordinated to defined-term "Designated Senior Indebtedness." Neither provision supports Wachovia's claimed entitlement to full contractual subordination.

**(1)** **Section 10.2 Does Not
Support Wachovia's Argument
Because, Pursuant To The Indenture,
Lender Debt Simply May Not Enjoy
<u>The Benefits Of Full Contractual Subordination</u>.**

14.     In order for Wachovia's argument to take root in Indenture Section 10.2, borrowings under the Pre-Petition Secured Credit Agreement necessarily must fit within the Indenture definition of "Senior Indebtedness."  That definition includes two categories of debt: (1) borrowings under "the Bank Credit Facility," which phrase is in turn defined to include the Pre-Petition Secured Credit Agreement; and (2) other debt falling within the Indenture definition of "Indebtedness," which in turn refers largely to borrowed money, like the debt owed under the Pre-Petition Secured Credit Agreement.

15.     The definition of "Senior Indebtedness" continues, however, to specifically exclude (through the proviso "[n]otwithstanding the preceding") a litany of specified kinds of debt.  One such exclusion bears the number (4) and carves-out of the definition of "Senior Indebtedness" any debt "that is Incurred in violation of this Indenture".   Since the Pre-Petition Secured Credit Agreement was executed *after* the Senior Subordinated Notes were issued, exception number (4) necessarily implicates Indenture Section 3.9, entitled "Limitation on the Incurrence of Additional Indebtedness."

16.     Indenture Section 3.9 afforded the Debtors some flexibility to incur debt after the issuance of the Senior Subordinated Notes, but it also imposed significant limitations on that authority.  In particular, it authorized the Debtors to incur certain "Permitted Indebtedness," which term is defined to include up to $100 million in borrowings under the Pre-Petition Secured Credit Agreement, plus an additional miscellaneous $10 million "bucket" of debt.  But, Section 3.9 also prohibited the Debtors from incurring any debt above the $110 million threshold unless,

at the time the Debtors intended to incur such additional debt, their financial performance met or exceeded a "Consolidated Fixed Charge Coverage Ratio" of 2.0 to 1.0.

17.    Whether the Debtors' financial performance could have met or exceeded the requisite 2.0 to 1.0 Consolidated Fixed Charge Coverage Ratio on the date of first borrowings under the Pre-Petition Secured Credit Agreement is a matter attested to in the *Declaration Of Thomas P. Jeremiassen In Support Of Confirmation Of Second Amended Joint Chapter 11 Plan Of Liquidation Of The Official Committee Of Unsecured Creditors, The Ad Hoc Committee Of Secured Lenders, And The Ad Hoc Committee Of Senior Subordinated Noteholders*, dated June 9, 2008 and filed substantially contemporaneously with this Reply (the "Jeremiassen Affidavit").    The Jeremiassen Affidavit evidences that, based on presently available information, it now appears unlikely that, on the date of first borrowings under the Pre-Petition Secured Credit Agreement, the Debtors' financial performance could have met or exceeded the requisite 2.0 to 1.0 Consolidated Fixed Charge Coverage Ratio.    Wachovia has informed the Plan Proponents that it does not intend to introduce at the confirmation hearing any evidence establishing a contrary factual understanding.    Although the Trustee and LECG have not reconstructed the financial statements, the Trustee has been able to reconstruct the books and records sufficiently to determine that net income for the applicable periods was negative.    With net losses, there could be no EBITDA and the Consolidated Fixed Charge Coverage Ratio could not have been met.

18.    Thus, it does not now appear that borrowings under the Pre-Petition Secured Credit Agreement in excess of $110 million fit within the Indenture definition of "Senior Indebtedness."    It therefore does not now appear that Indenture Section 10.2 affords

Lenders an entitlement to contractual seniority above $110 million. This aspect of the Wachovia Plan Objection is not sustainable.

> (2) **Section 10.3 Also Does Not Support Wachovia's Argument Because Section 10.3 Is Not A Subordination Provision And, Even <u>If It Is, The Triggering Default Has Been Waived</u>**.

> (A) <u>Section 10.3 Is Not A Subordination Provision</u>.

19. Essentially conceding the difficulty it has rooting its Plan Objection in Indenture Section 10.2, Wachovia now advances that Indenture Section 10.3 independently affords Lenders entitlement to full contractual subordination. According to the Wachovia Plan Objection, the benefits of Section 10.3 are not limited to claims fitting only within the definition of "Senior Indebtedness." Rather, this section benefits holders of "Designated Senior Indebtedness," which is defined to include all borrowings under the Pre-Petition Secured Credit Agreement, even those above $110 million.

20. The problem with Wachovia's argument is that Section 10.3 is not a subordination provision. Section 10.3 provides only that, following a default under the Pre-Petition Credit Agreement, the Debtors may not make payments on the Senior Subordinated Notes. That is a negative covenant, and such a clause is insufficient to create an enforceable right to contractual seniority. See In re Holly's, Inc., 140 B.R. 643, 675 (Bankr. W.D. Mich. 1992) ("the promise not to pay Holly's until other contractually higher priority creditors are first paid does not meet the definition of a subordination agreement."); Hunt Energy Co., Inc. v. U.S. (In re Hunt Energy Co., Inc.), 48 B.R. 472, 486 (Bankr. N.D. Ohio 1985) (negative covenants in loan documents do not constitute subordination agreements), rev'd on other grounds, 1988 U.S. Dist. LEXIS 14295 (N.D. Ohio June 29, 1988); see also Heller Financial v. Prudential Ins. Co. of Am., 371 F.3d 944, 946 (7th Cir. 2004) (Posner, C.J.) (contractual provisions that do not

expressly subordinate one loan to another do not create contractual subordination enforceable under the Bankruptcy Code); Chemical Bank v. First Trust of N. Y. (In re Southeast Banking Corp.), 156 F.3d 1114, 1119 (11th Cir. 1998) ("[i]n enforcing subordination agreements ... the courts have emphasized that the junior creditor's agreement to subordinate must be express."); In re Smith, 77 B.R. 624, 628 (Bankr. N.D. Ohio 1987) ("the subordination agreement is to be construed strictly against the party drawing it").

21.     Actual subordination provisions found elsewhere in the Indenture further establish the fallacy of Wachovia's position: Section 10.1 (in which holders of Senior Subordinated Notes explicitly agreed that their debt was subordinate, but only to holders of "Senior Indebtedness," not holders of "Designated Senior Indebtedness"); Section 10.2 (discussed above); Section 10.5 (providing that distributions improperly made to holders of Senior Subordinated Notes are held in trust, but only for the benefit of holders of "Senior Indebtedness," not holders of "Designated Senior Indebtedness"); and Section 10.6 (providing subrogation rights to holders of Senior Subordinated Notes, but only after "Senior Indebtedness" has been satisfied, not after "Designated Senior Indebtedness" has been satisfied).     These Indenture provisions further evidence the fact that Wachovia's argument lacks merit. See Beanstalk Group, Inc. v. AM Gen. Corp., 283 F.3d 856, 860 (7th Cir. 2002) ("a contract must be interpreted as a whole.  Sentences are not isolated units of meaning, but take meaning from other sentences in the same document.") (internal citations omitted).  This aspect of the Wachovia Plan Objection is simply not sustainable.

22.      By its express terms, Lender rights under Section 10.3 evaporate, and distributions to holders of Senior Subordinated Notes may resume, if the triggering default is waived (See Indenture §§ 10.3(b), 10.3(d).)

23.      As noted above, institutions holding approximately two-thirds of the debt under the Pre-Petition Secured Credit Agreement voted in favor of the Plan and, in so doing, agreed to amend the Pre-Petition Secured Credit Agreement to waive any default that triggered Lender rights under Indenture Section 10.3.[5]  Specifically, Plan Section 13.07 provides, in pertinent part, as follows:

> To the extent "Required Lenders" (as such term is defined in the Pre-Petition Secured Credit Agreement) vote to accept the Plan: (i) the Pre-Petition Secured Credit Agreement shall be deemed amended, supplemented and modified in a manner consistent with the terms of the Plan; and (ii) any Default or Event of Default (as such terms are defined in the Pre-Petition Secured Credit Agreement) shall be deemed waived to the extent such Default or Event of Default is inconsistent with the terms of the Plan.  For the avoidance of doubt, such affirmative vote by "Required Lenders" shall be deemed an amendment to the Pre-Petition Secured Credit Agreement explicitly providing that Lenders are entitled to rights of contractual subordination senior to the Senior Subordinated Notes Indenture Trustee and holders of the Senior Subordinated Notes only to the extent provided for in the Plan, and any Default or Event of Default arising there from shall be deemed waived.

24.      The term "Required Lenders" is defined in the Pre-Petition Secured Credit Agreement to mean "Lenders holding in the aggregate a majority of … the outstanding Loans." Pursuant to Section 9.1 of that Agreement, "Required Lenders may … waive, on such terms and conditions as the Required Lenders may specify … any Default or Event of Default and its

---

[5]      Plan Section 13.07, by its terms, is effective once the Plan has been confirmed and becomes effective by its terms.

consequences." Section 9.1 further provides that "[a]ny such waiver … shall be binding upon … the Lenders [and] the Administrative Agent."

25.     More than a majority of the Lenders (i.e., the "Required Lenders") have voted in favor of the Plan and, in turn, Plan Section 13.07. In other words, the "Required Lenders" have waived any default trigger purportedly giving Wachovia full subordination rights under Indenture Section 10.3. Again, this aspect of the Wachovia Plan Objection is not sustainable.

**b.      Wachovia Cannot Prohibit The Lenders From Effectuating The Contractual Subordination Settlement By Amendment To The Pre-Petition Secured Credit Agreement.**

26.     Even presuming, for the sake of argument, that Lender claims over $110 million might otherwise constitute "Senior Indebtedness" for purposes of Indenture Section 10.2, Wachovia's argument still does not prevail. Again, the Indenture definition of "Senior Indebtedness" excludes (through the proviso "[n]otwithstanding the preceding") a litany of specified kinds of debt. A different exclusion than the one referenced in Paragraph 15 above, bears the number (7) and carves-out of the definition any debt "that, by its express terms, is not senior." Thus, if the Pre-Petition Secured Credit Agreement was amended (which it will be effective on the Effective Date of the Plan) to harmonize Lender subordination rights to the Contractual Subordination Settlement, Wachovia would – by definition – have no greater seniority entitlement than that provided for in the Plan.

27.     As quoted above, Plan Section 13.07 constitutes an amendment, supplement, and modification of the Pre-Petition Secured Credit Agreement that explicitly harmonizes Lender subordination rights to the Contractual Subordination Settlement. Pursuant

to Section 9.1 of the Pre-Petition Secured Credit Agreement, the Lenders are empowered to effectuate this modification either as a stand-alone amendment or as part of their Plan vote:

> The Required Lenders may … enter into … written amendments, supplements or modifications hereto … for the purpose of adding any provisions to this Agreement … or changing in any manner the rights of the Lenders … hereunder.

> Notwithstanding the fact that the consent of all the Lenders is required in certain circumstances as set forth above, (x) each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code supersedes the unanimous consent provisions set forth herein.

No other provision of the Pre-Petition Secured Credit Agreement prohibits an amendment, supplement, or modification incorporating the provisions of Plan Section 13.07.[6]

28.     Modification to the Pre-Petition Secured Credit Agreement (Plan Section 13.07) has resulted in an exclusion from the definition of "Senior Indebtedness" of any right to contractual seniority claimed by Wachovia that is inconsistent with the Contractual Subordination Settlement.  Accordingly, Wachovia does not have any additional senior rights to assert.  For this reason too, the Objection point is not sustainable.

---

[6]     To the contrary, other provisions of the Pre-Petition Secured Credit Agreement further support a reading that empowers Required Lenders to modify (by amendment to the Agreement) all Lenders' rights of contractual subordination.  Section 6.8, for example, specifically contemplates Required Lenders having the authority to consent (on behalf of all Lenders) to modifications of subordination of the Senior Subordinated Notes.  Also, the above-quoted "waiver" provisions of Section 9.1 enable the Required Lenders to waive (on behalf of all Lenders) any defaults arising under Section 7.1(l) occasioned by the Senior Subordinated Notes ceasing to be fully subordinated to Lender debt.  These provisions provide important guidance because, as noted above, the law finds contractual context highly probative in ascertaining an agreement's true meaning. See Beanstalk Group, 283 F.3d at 860 ("a contract must be interpreted as a whole. . . .  Sentences are not isolated units of meaning, but take meaning from other sentences in the same document.") (internal citations omitted).

       **c.**       **The Lenders' Overwhelming Vote In Favor Of The**
                           **Plan Binds Wachovia, As A Member Of The Lender Class.**

       29.      Contrary to its protestations, Wachovia can be bound to the Contractual Subordination Settlement by the affirmative vote of the Lender Class. See Bartle v. Markson Bros., 314 F.2d 303, 305 (2d Cir. 1963) (class of senior creditors may vote in favor of a plan that compromises rights of contractual subordination and, in so doing, may bind other class members to such compromise, even if such other class members vote against the plan).

       30.      The proposition is also supported by the Bankruptcy Code's legislative history. See H.R. REP. NO. 95-595, at ¶ 510 (1977), as reprinted in C-D COLLIER ON BANKRUPTCY, App. Pt. 4, at 359 (15th ed. rev. 2008) ("A subordination agreement will not be enforced, however, in a reorganization case in which the class that is the beneficiary of the agreement has accepted, as specified in proposed 11 U.S.C. § 1126, a plan that waives their rights under the agreement. Otherwise, the agreement would prevent just what chapter 11 contemplates: that seniors may give up rights to juniors in the interest of confirmation of a plan and rehabilitation of the debtor."); see also S. REP. NO. 95-989, at ¶ 510 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787 (same).

       31.      And, it is supported by leading bankruptcy treatises. See 4 COLLIER ON BANKRUPTCY, ¶ 510.03[4] (15th ed. rev. 2008) ("If a class that is a beneficiary of a subordination agreement accepts a plan that modifies or eliminates the subordination, then the agreement as modified, or eliminated, will be enforced in lieu of the original agreement. If subordination agreements were not waivable under a plan of reorganization acceptable to the senior creditor, the section would prevent just what Congress envisioned: that senior creditors may compromise with junior creditors in order to confirm a plan."); 7 COLLIER ON BANKRUPTCY, ¶ 1129.03[7][c][v] (15th ed. rev. 2008) ("Once the relationship is established between the debtor

and the subordination agreement the rights of senior creditors vis-à-vis subordinated creditors might be affected, provided that two-thirds in amount and a majority in number of the senior class, voting for or against the plan, accept the plan."); Sally McDonald Henry, ORDIN ON CONTESTING CONFIRMATION § 6.11[B] (3d ed. Aspen 2004) ("The bulk of authority suggests that the Bankruptcy Court has the power to bind non-consenting senior lenders to a plan that extinguishes their subordination rights.").

32.    As noted above, the Lenders have voted <u>overwhelmingly</u> in favor of the Plan.   In accordance with Bankruptcy Code Section 1126, the Lenders have accepted the Contractual Subordination Compromise.   As a matter of law, it is now binding on Wachovia. With finality, this aspect of the Wachovia Plan Objection is not sustainable.

**2.    Wachovia's Contention That The Plan Fails The "Best Interests" Test Is Not Supported By The Facts Or The Law.**

33.    The Wachovia Plan Objection contends that the Plan fails the "best interests" test of Bankruptcy Code Section 1129(a)(7).   The conclusion rests on three sub-arguments: (1) that, notwithstanding the preceding analysis, Wachovia would enjoy rights of full contractual subordination in a Chapter 7 liquidation; (2) the costs of borrowing under the proposed exit facility are high; and (3) the assumptions underlying the Plan Proponents' "best interests" test analysis (attached to the Disclosure Statement as <u>Exhibit M</u>) are unreasonable. Tellingly, Wachovia does not cite a single published opinion or provide one stitch of evidence in support of *any* of these arguments.

34.    The assumption in the Liquidation Analysis is that in a Chapter 7, a similar settlement would be reached.   In order for Wachovia to prevail on its objection to the liquidation analysis based on the subordination settlement, it would have to demonstrate that it is more likely than not that in a chapter 7 case, the subordination provisions would be enforced

more favorably than the result in the settlement. In light of the evidence of the Debtor's prepetition financial condition, this Court could not reasonable conclude that in a chapter 7 the subordination provisions would be enforceable to the maximum extent. Dec. of Tom Jeremiassen; DePaul Dec. at Exhibit 5). The Plan Proponents have and will present admissible evidence supporting the assumptions in the Liquidation Analysis that in a chapter 7, either the same settlement, or a less favorable result is likely to be obtained and that after taking into account the risks and costs of protracted litigation, a Chapter 7 Trustee is likely to reach the same settlement (or one less favorable). Wachovia has not introduced any contrary evidence. Accordingly, this objection must be overruled.

35. Second, Wachovia's protestations about the expense of the proposed exit facility do not *prove* that its terms are excessive by market standards. It bears noting that the proposed exit facility was filed with this Court more than one year ago and, over the succeeding 12-months, neither Wachovia nor any other potential financier offered to provide credit to the estates on *any* terms, let alone less expensive terms. Regardless, the cost of capital under the proposed exit facility is a matter attested to in the *Affidavit Of Jim Feltman In Support Of Confirmation Of Second Amended Joint Chapter 11 Plan Of Liquidation Of The Official Committee Of Unsecured Creditors, The Ad Hoc Committee Of Secured Lenders, And The Ad Hoc Committee Of Senior Subordinated Noteholders*, dated June 9, 2008 and filed substantially contemporaneously with this Reply, as market consistent. When conducting an analysis under Bankruptcy Code Section 1129(a)(7), it must be presumed that a Chapter 7 trustee also would require post-petition financing, presumably on these terms (since they are market consistent) or

perhaps on substantially worse terms. Absent any evidence to the contrary, Wachovia's Objection lacks foundation.[7]

36. Finally, the assumptions underlying the "best interests test" analysis are supported by testimony provided by the Chapter 11 Trustee, Messrs. Jeremiassen and Kirschner, as well as by the expert opinion provided by Mr. Feltman. The analysis also comports with common sense. See In re Applied Safety, Inc., 200 B.R. 576, 587 (Bankr. E.D. Pa. 1996) (requirements of Bankruptcy Code Section 1129(a)(7) met because Chapter 7 trustee would likely not litigate cause of action, estate's only asset, without funding, which was not available, and, in any event, creditors would not receive more were Chapter 7 trustee to pursue the litigation than under Chapter 11 plan). Again, Wachovia offers no *evidence* to the contrary. The Plan Proponents have carried their evidentiary burden; this Objection point should not be sustained.

---

[7]      Wachovia also claims that, though the exit loan, members of the *Ad Hoc* Lenders Committee "effectively will continue to wield veto power over any significant settlement of estate claims." (Wachovia Plan Objection ¶17.) This is false. Pursuant to the proposed exit credit agreement, the liquidation trust will be required to obtain the consent of a supermajority of exit lenders to consummate settlements above $500,000, but only while the principal amount of the loan ($15 million) remains extant. Once the $15 million loan is repaid (presumably by early litigation recoveries), the exit lenders will lose all consent entitlements. In this regard, the consent rights afforded the exit lenders are no different than a run-of-the-mill bank financing arrangement, where the borrower must garner the lender's consent before liquidating significant aspects of its collateral base, but loses all consent rights once the loan is repaid. In a case where creditors are "banking" on litigation recoveries many times the aggregate amount of exit borrowing availability, this consent right (though understandably important to the proposed lenders) is a rather trivial estate concession for necessary financing and, in fact, will never be triggered if (as expected) early litigation settlements will generate proceeds sufficient to repay the loan in full.

**3.** **Wachovia's Contention That The Plan**
**Unfairly Discriminates Against Its Claims**
**Is Not Supported By The Facts Or The Law.**

37.     Wachovia's "unfair discrimination" argument essentially breaks down into two pieces: (1) that the Plan purportedly deems Wachovia Claims "Disputed Claims" while all other Lender claims are deemed by the Plan "Allowed Claims;" and (2) that the Plan purportedly does not reserve sufficient funds for Wachovia's administrative and secured claims.   Neither Objection has merit.

38.     First, the Plan does not deem Wachovia Claims "Disputed Claims."   It simply does not deem them "Allowed Claims," like other Lender claims.   Contrary to Wachovia's argument, this difference in treatment does not offend Bankruptcy Code Section 1123(a)(4).  See, e.g., Enron Corp. v. New Power Co. (In re New Power Co.), 438 F.3d 1113, 1122-23 (11th Cir. 2006) (delayed receipt of distributions to members of a class whose claims remain disputed does not, in and of itself, violate § 1123(a)(4)); Bustop Shelters v. Classic Homes, Inc., 914 F.2d 810, 814 n.7 (6th Cir. 1990) ("[T]he requirement of 11 U.S.C. § 1123(a)(4) that all claims or interest of the same class receive the same 'treatment' does not appear to be violated by the escrowing of one class member's payments pending the outcome of disputes over the claim's validity."); In re Paolini, 312 B.R. 295, 314 (Bankr. E.D. Va. 2004) ("the existence of a dispute over claim validity does not support a separate classification.").

39.     It is, in fact, normal and routine for plans to jointly classify (1) claims that have been allowed prior to or in connection with confirmation and (2) similarly situated claims that will be considered post-consummation, as part of the normal claims reconciliation process following the plan's effective date.   That plan mechanic is, for example, widely-accepted and widely-employed for classifying and resolving general unsecured (trade) claims.

40.     Second, the Plan does provide for full reservation of any distributions on account of Wachovia's claims, pending final claims adjudication.  Plan Section 5.01(c) explicitly commands the liquidation trust to reserve the full amount of Wachovia's administrative claims on the Plan's effective date.  In addition, Plan Section 8.03 explicitly commands the liquidation trust to reserve the pro rata amount of Wachovia secured and unsecured distributions, based on the face amount of Wachovia Claims, when such distributions are otherwise distributable to Lenders.  The Plan's reserve mechanics ensure that the liquidation trust will have 100% availability to deliver to Wachovia a full "catch-up" distribution amount (plus interest), should a court of competent jurisdiction ultimately allow the Wachovia Claims in full.

41.     Wachovia's treatment is, in fact, far better than the treatment reserved for all other holders of Class 1 and Class 4A claims.  Other Lender distributions may, at the liquidation trust's discretion, be utilized (essentially, "re-lent") to the trust for purposes of funding its operations, including prosecution of estate causes of action, with no guaranty of "repayment."  Wachovia does not bear this risk.  If anything, Wachovia's complained "discrimination" is quite beneficial by comparison to the treatment reserved for all other Lenders.  The Objection point is not sustainable.[8]

---

[8]     Even if the Court were to accept Wachovia's arguments under Bankruptcy Code Section 1123(a)(4), Wachovia would still not be entitled to hold up confirmation of the Plan if its claims were separately classified, as the Plan's treatment of Wachovia's claims would, in any event, still satisfiy the requirements of Bankruptcy Code Section 1129(b).  With respect to Wachovia's secured claim, it would receive the indubitable equivalent of its claim in the form of a full reserve for such claim pending a determination on allowance.  See Bankruptcy Code Section 1129(b)(2)(A)(iii).  With respect to Wachovia's unsecured claim, Bankruptcy Code Section 1129(b)'s requirements would be satisfied in that no class lower in priority than Wachovia's class would receive any distribution until Wachovia's claims (to the extent allowed) had been satisfied in full.  See Bankruptcy Code Section 1129(b)(2)(B)(ii).

4.     **Wachovia's Contention That The Plan
       Has Been Proposed In Good Faith Is
       <u>Not Supported By The Facts Or The Law</u>.**

42.     Wachovia's wild accusations of self-dealing and bargaining improprieties are also completely unsupported by the facts.[9]  The testimonial affidavits and other documents attached to the DePaul Declaration convincingly evidence good faith, arm's-length negotiations. No contrary evidence has been provided by Wachovia, because no contrary evidence exists. Hence the reason why Wachovia cancelled all further depositions after completing only half the number of depositions demanded.

43.     The Third Circuit has stated that, for "good faith" analysis under Bankruptcy Code Section 1129(a)(3), "the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 242 (3d Cir. 2000) (quoting <u>In re Abbotts Dairies of Pa., Inc.</u>, 788 F.2d 143, 150 n.5 (3d Cir. 1986)).  In this regard, the record is eminently clear.  The Plan settles a myriad of complex issues that, if otherwise left for litigation and/or settlement on a piece-meal basis, would likely involve enormous administrative cost, undue uncertainty for all constituents, as well as significant time and judicial burden.  It also marshals estate resources in an elegant and remarkably efficient way, to enable full cash realization of the estates' most important assets  -- their claims and causes of action against those parties (like Wachovia) that helped facilitate corporate wrongdoing and the Debtors' financial

---

[9]     Moreover, Wachovia's assertions that Harbinger Capital Partners' holdings in the Senior Subordinated Notes were "concealed" are similarly baseless.  Harbinger's investments in the Senior Subordinated Notes, as well as its participation in the negotiations leading to the settlement embodied in the Plan, have been disclosed on countless occasions to the Court and parties in interest, including in the Disclosure Statement.  (<u>See</u> DePaul Dec. at Ex. 2; <u>e.g.</u> §3.07).

collapse. It will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. This Objection point is not sustainable.

44. In the end, Wachovia has no facts to support its "bad faith" allegation other than to point out that the same Committees that <u>negotiated</u> the Plan had members that had some holdings that were represented by other Committees. Unfortunately for Wachovia, this fact has been disclosed by the Committees for **over one year** -- it has been in the Disclosure Statement since March 2007. Moreover, regardless of the composition of the Committees that <u>negotiated</u> the Plan, individual creditors <u>voted to accept</u> the Plan nearly unanimously after the disclosure of the composition of the Committees was provided.

**5. Wachovia's Contention That The Plan Is Not <u>"Feasible" Is Not Supported By The Facts Or The Law.</u>**

45. Wachovia fares no better challenging the Plan's feasibility. As attested to in the Jeremiassen Affidavit, more than sufficient funds are available to make all payments necessary on the Plan's effective date. Thereafter, a significant reserve remains to cover litigation expenses. Thereafter still, the Plan empowers the trust to further utilize Lender collateral (other than Wachovia's collateral) and tap unencumbered value, *at its discretion*, to satisfy additional administrative needs and professional costs. The Plan works and, as a consequence, Wachovia presses a challenge to the Plan Proponents, to wit: it demands that the Plan Proponents predict, with some level of certainty, how many millions of dollars the trust will need to fund all of its future operations; then, it argues that the Bankruptcy Code compels all

such amounts be reserved, or else the Plan fails the feasibility test.  The law does not impose

such a burden.[10]

46.     Generally speaking, Bankruptcy Code Section 1129(a)(11) requires the

Court to make an independent determination as to whether the Plan is workable and has a

reasonable likelihood of success.  See Sea Garden, 195 B.R. 294, 304-05 (D.N.J. 1996); see also

CoreStates Bank, 202 B.R. 33, 45 (E.D.Pa. 1996) (affirming bankruptcy court determination of

feasibility); In re Am. Family Enters., 256 B.R. 377, 404 (D.N.J. 2000).  This requirement

generally encompasses two related determinations: (i) that the proponent is able to consummate

the provisions of the plan, and (ii) if consummated, the plan has a reasonable chance to succeed.

See In re Lakeside Global II, Ltd., 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) ("This definition

[of feasibility] has been slightly broadened and contemplates whether [(i)] the debtor can

realistically carry out its plan and [(ii)] whether the plan offers a reasonable prospect of success

and is workable.")  (internal citations omitted).

47.     "The standards needed to achieve plan feasibility are not rigorous." In re

Mayer Pollock Steel Corporation, 174 B.R. 414, 421 (Bankr. E.D. Pa. 1994) (quoting In re Orfa

Corp. of Philadelphia, 129 B.R. 410-411 (Bankr. E.D. Pa. 1999).

---

[10]     In the Objection, Wachovia also challenges confirmation of the Plan on the basis of its
claim for reimbursement of fees and expenses incurred in these cases.  Under the Pre-
Petition Secured Credit Agreement, Wachovia's reimbursement rights are limited to two
situations; reimbursement for fees and expenses incurred: (a) "in connection with
enforcing rights of the Lenders" under the agreement; and (b) "in connection with
enforcing its rights as a Lender" under the agreement or otherwise with respect to
obligations owed it by the Debtors.  (See DePaul Dec. at Ex. 43; §2.12(b)).  A review of
the time records for Wachovia's counsel (See DePaul Dec. at Ex. 31), however, clearly
reveals that, instead of enforcing the rights of the other Lenders (whose positions in these
cases Wachovia has opposed at nearly every turn) or even its own rights as a Lender,
Wachovia's efforts have been focused solely on furthering its individual interests as a
potential litigation defendant.  As such, little (if any) of the over $3 million in fees and
expenses Wachovia seeks are properly reimbursable under the Pre-Petition Secured
Credit Agreement.

48. For plans of liquidation like the one before this Court, the feasibility test is relaxed even further. Indeed, the statute itself narrows its applicability for plans of liquidation, mandating a finding that: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, *unless such liquidation or reorganization is proposed in the plan*." 11 U.S.C. § 1129(a)(11) (emphasis added); see also In re Heritage Organization, L.L.C., 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007) ("Several courts take a narrow approach and interpret the plan language of § 1129(a)(11) to say that feasibility need not be established when liquidation is proposed in the plan."); In re Machne Menachem, Inc., 371 B.R. 63, 71-2 (Bankr. E.D. Pa. 2006) (holding that feasibility test is inapplicable to plan that left the debtor without a continuing business, only funds and the ability to litigate estate causes of action); In re 47th and Belleview Partners, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) (considering liquidation plan, feasibility found to be "unnecessary").

49. Moreover, where the plan contemplates the creation of a liquidation trust, ostensibly for the pursuit of estate litigation, the proponent has no obligation to guarantee success or that trust funds will last through trial. See Heritage Organization, 375 B.R. at 312; see also In re Applied Safety, Inc., 200 B.R. 576, 586 (Bankr. E.D. Pa. 1996) (plan did not fail the feasibility test, even though reorganization was at least partially dependent on the success of litigation, holding: "As long as a lawsuit has a reasonable chance of success, depending on it for funding is no more or less contingent than depending on sales projections or other more traditional indicia of business success. In either case the projections are in essence educated guesses at predicting the future.") (internal citations omitted).

50.     In this regard, Judge Houser's statements in <u>Heritage Organization</u> are particularly instructive:

> The Plan Proponents need not establish that success in pursuing the litigation is guaranteed, or that the creditor trust's funds will never run out. <u>In re T-H New Orleans L.P.</u>, 116 F.3d 790, 801 (5th Cir. 1997) (the court "need not require a guarantee of success"). The Plan Proponents need only establish that the Second Amended Plan is "feasible." The Second Amended Plan does not propose to pay all creditors no matter what, 100 cents on the dollar; instead, the Second Amended Plan contemplates that all assets (including causes of action) will be transferred to a trust, the trust will pursue certain litigation, and creditors will receive their pro rata share of whatever money the trust recovers, if any. That course of action is unquestionably feasible, given that the creditor's trust will have approximately $1.7 million with which to pursue recovery of further asserts for the benefit of creditors.

<u>Heritage Organization</u>, 375 B.R. at 312.

51.     The Plan is remarkably similar to the plan at issue in <u>Heritage Organization</u>, providing for: (i) the creation of a liquidation trust; (ii) the vesting of such trust with estate assets, especially estate causes of action; (iii) borrowing availability under a $15 million exit loan; (iv) the immediate establishment of an $8.5 million administrative reserve; (v) availability and subsequent access to many additional millions to fund the prosecution of estate litigation; and (vi) the distribution of litigation proceeds to creditors. As in <u>Heritage Organization</u>, the proposed "course of action is unquestionably feasible." <u>Id</u>. This aspect of the Objection is not sustainable.

**6.      Wachovia's Contention That
The Plan Improperly Provides
For Substantive Consolidation Is
<u>Not Supported By The Facts Or The Law</u>.**

52.     Wachovia's opposition to the Plan's contemplated substantive consolidation is "much ado about nothing." The Wachovia Plan Objection essentially concedes that, as a matter of estate economics, substantive consolidation bears only on which creditors

share in the sale proceeds of certain real property once held by Debtor Tea Systems International, Inc., amounting only to $1.4 million. To obviate any discord over the issue, the Plan allocates those sale proceeds only to TSI creditors (see Plan §§ 5.04, 5.05, and 5.06), although other creditors have the right to move this Court post-consummation for a reallocation if the facts warrant (see Plan § 8.01(c)). The Plan's substantive consolidation provisions do not work any injustice on any party. For this reason alone, the Objection point is not sustainable.[11]

**B.    Wachovia's Meaningless Discovery Dispute Does Not
Form A Legitimate Basis To Deny Confirmation Of The Plan.**

53.    Left with no substantive base to rest its Plan Objection, Wachovia advances a frivolous assertion that the Plan Proponents denied it an opportunity to take discovery in connection with Plan confirmation. The contention must be rejected out-of-hand.

54.    On April 15, 2008, Wachovia served numerous document requests on the Plan Proponents (the "Discovery Requests"). Wachovia demanded responses by May 5, 2008. Each of the Plan Proponents served their responses and objections on May 5, 2008, as requested. Thereafter, beginning on May 8, 2008 (per agreement reached with Wachovia during discovery conferences), the Plan Proponents commenced "rolling" productions of documents, ultimately delivering to Wachovia thousands of pages. Wachovia also demanded and obtained significant document discovery from Mr. Kirschner, the anticipated liquidation trustee and Mr. Feltman, the Committee's expert witness.

55.    The documents produced reflected negotiations leading to the Plan's development, the evolution of each Plan Proponent's position on key Plan terms, as well as other

---

[11]    Regardless, it bears noting that, in light of the evidence proving management's wrongful behavior and "doctoring" of the Debtors' historic books and records, this case falls well within the rubric in which substantive consolidation would be appropriate. See In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005).

matters pertinent to Plan confirmation. Thus, Wachovia was afforded a full opportunity to discover those and related subjects. The documents reflected – although apparently to Wachovia's dissatisfaction – the arm's-length and, in fact, hotly contested nature of the Plan negotiations. Indeed, the documents prove that the Plan was not the product of any sort of "sweatheart" dealing, but rather the product of the give-and-take emanating from tough negotiations involving sophisticated individuals.

56.     Wachovia also noticed eight depositions. Wachovia took three full days of depositions, involving four witnesses (the Chapter 11 Trustee, Rule 30(b)(6) witnesses produced by the Official Creditors' Committee and the *Ad Hoc* Noteholders' Committee, and a member of the *Ad Hoc* Lenders' Committee). Four remaining depositions were scheduled for the weeks of June 2, 2008 and June 9, 2008. However, on May 30, 2008, Wachovia's counsel telephoned counsel to the *Ad Hoc* Lenders' Committee offering to cancel all remaining depositions, including depositions of Harbinger Capital (which figures prominently in Wachovia's "bad faith" allegations) and the Plan Proponents' expert, Mr. Feltman, in exchange for a short continuance of its objection deadline. The offer was accepted, and the continuance was granted. Offering to terminate all remaining deposition discovery was a decision unilaterally made by Wachovia, completely unprovoked by the Plan Proponents.

57.     With respect to the four depositions taken, Wachovia claims that the Plan Proponents "employed all conceivable methods of obstructing the depositions." This bare and inaccurate accusation rests on nothing more than a small number of isolated instructions over a span of 770 cumulative pages of deposition transcript, reflecting many deposition hours. Regardless, even a cursory review of the cited transcripts confirms, in context, the propriety of such objections. And, it should be noted that, other than the issue of common interest on which

the Court disagreed with Wachovia's position, Wachovia never once sought relief from the Court respecting any of the instructions interposed.

58.     Accordingly, Wachovia's assertion that it was deprived discovery is meritless.  It is yet another attempt to divert attention from the core issue presently before the Court – a determination of the fairness of the Plan.

**C.      Wachovia's Allegation Of Faulty Solicitation
Process Is Neither Factually Accurate Nor A
<u>Legitimate Basis To Deny Confirmation Of The Plan</u>.**

59.     Wachovia's attack on the Plan Proponents' solicitation efforts is equally frivolous.  As the record makes clear, shortly after the Court entered Orders approving the Disclosure Statement and authorizing solicitation and voting procedures, the Plan Proponents began soliciting Plan acceptances in accordance with such Order.  Among other things, they mailed an envelope to each creditor and stockholder, containing copies of: (i) the Plan; (ii) the Disclosure Statement (including all exhibits thereto); (iii) the Disclosure Statement Order; (iv) the Court's amended scheduling Order, dated April 15, 2008 [Docket Number 1996]; (v) the notice fixing the time for casting ballots, the deadline for filing objections, and the confirmation hearing; and (vi) all requisite ballots (collectively, the "<u>Solicitation Package</u>").  (<u>See</u> DePaul Dec. at Exhibit 12).  The parties receiving Solicitation Packages included all creditors and stockholders identified on the Debtors' schedules, all creditors who filed proofs of claim, and all parties who submitted written requests for notice, as required by Bankruptcy Rule 2002.  (<u>See</u> DePaul Dec. at Exhibit 12).

60.     Requests for additional Solicitation Packages were received by the Plan Proponents from and through various parties and, as a result, additional Solicitation Packages were mailed to the parties listed on the Certificate of Service, dated and filed with the Court on

May 12, 2008 [Docket Number 2026]. (See DePaul Dec. at Exhibit 12). The Plan Proponents also distributed a "supplemental notice," supplementing the Disclosure Statement, which was distributed to all parties who were required to receive a Solicitation Package pursuant to the Disclosure Statement Order and to all parties who separately requested Solicitation Packages. The supplemental notice was mailed to the parties listed on the Certificate of Service, dated and filed with the Court also on May 12, 2008 [Docket Number 2027]. (See DePaul Dec. at Exhibit 12). All creditors, parties filing a request for notice or that requested a Solicitation Package in these bankruptcy cases were mailed a Solicitation Package, including ballots and a copy of the Supplemental Notice, no later than twenty-five (25) days prior to the deadline for objecting to confirmation of the Plan. (See DePaul Dec. at Exhibit 12).

61. Furthermore, the Plan Proponents provided constructive notice of applicable deadlines and other information contained in the Disclosure Statement Order through the publication of "tombstone" advertisements in the May 9, 2008 editions of The Wall Street Journal and The Pittsburgh Tribune Review. (See DePaul Dec. at Exhibit 13).

62. At the conclusion of the solicitation process, 203 ballots were returned, aggregating more than $1.6 billion in claims. Holders of approximately 74% in Lender claims voted on the Plan. Holders of more than 95% of the Senior Subordinated Notes voted on the Plan. Holders of approximately $124.8 million in general unsecured (trade) claims voted on the Plan. Good and appropriate service of the Solicitation Package was provided and the vote response was strong. This aspect of the Wachovia Plan Objection has absolutely no merit.

**D.      The Court Should Dismiss The Wachovia Plan
           Objection As Nothing More Than A Litigation Ploy
           To Obstruct Funding For Estate Litigation Against Wachovia.**

63.      As indicated above, the Wachovia Plan Objection is simply the latest in a long line of pleadings interposed by Wachovia to obstruct the marshalling of estate assets and the creation of a deep "war chest" to fund estate litigation against it.  Under the circumstances, this Court is entitled to dismiss, or give substantially less weight to, the arguments asserted in the Wachovia Plan Objection.  See In re Heritage Org., L.L.C., 375 B.R. 230, 281-2 (Bankr. N.D. Tex. 2007).

64.      In Heritage, the plan at issue embodied a settlement eliminating complex and costly litigation among claimants and allowing confirmation of a plan that contemplated pursuit of litigation against the debtor's principal (which litigation was the estate's most valuable asset).   Not unlike Wachovia in the instant case, the potential litigation target in Heritage objected strenuously to confirmation of the plan in an effort to thwart the impending litigation. The observations of the Heritage court are instructive:

> As the targets of much of the Trustee's remaining litigation efforts, it is in
> the [objectors'] interest to block any settlements that the Trustee proposes,
> since the [objectors] would presumably like the estate to remain
> administratively insolvent and thus unable to pursue litigation against
> them.  The only objectants to the settlement therefore have a non-creditor
> interest in opposing any settlement by which the estate will receive funds,
> and the Court must therefore partially discount their opposition and
> conclude that their views of the merits of the settlement may be skewed.

Id. At 281-82.  See also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 465 (2d Cir. 2007) (in a similar context, where the lone objector to settlement was also a litigation target, the court noted: "Given the Settlement's funding of [the objector's] litigation opponent, [the] objection is understandable. Nevertheless, it is telling that no other creditor objects to the Settlement.").

65.	The <u>Heritage</u> Court offered the following further - and extremely relevant

- observations:

> [T]he Court cannot think of a legitimate reason why a . . . creditor would oppose confirmation of a simple plan of liquidation for [the debtor], which is what is proposed by the Second Amended Plan.  If the Second Amended Plan cannot be confirmed, the Court will have little alternative but to convert the Case to a case under Chapter 7 of the Bankruptcy Code.  The Case has been pending for over three years in Chapter 11, [the debtor] has no ongoing business to reorganize, and if this plan of liquidation cannot be confirmed, it is unlikely that any other plan of liquidation can be confirmed.  Accordingly, a liquidation of [the debtor's] remaining assets under Chapter 7 will be the only remaining alternative.  And, from this Court's perspective, conversion to Chapter 7 is not in the interest of any . . . creditor.
>
> The settlement proposed by the Trustee is, on balance, a reasonable settlement of these complex litigations.  The only parties in the Case that disagree with the Court's assessment of the settlement are the [objectors], who are named defendants in what the Trustee believes to be the estate's most valuable remaining asset – i.e., the litigation claims pending [against the objectors].  The proceeds realized from the settlement will provide the estate with the funds necessary to attempt to realize on this unliquidated, but potentially valuable asset.  If the settlement is not approved and these funds are not realized, the estate will be without the financial resources necessary to continue the [litigation] to conclusion.  Obviously, the [objectors] have a non-creditor interest is blocking approval of the settlement for this reason.  This non-creditor interest causes the Court to discount their objections to some extent.

<u>Id</u>. at 254.

66.	Wachovia's actions in these cases belie similar motives.  To the extent the Court does not immediately dispense with the Wachovia Plan Objection, the Court certainly should give all of its arguments and assertions comparatively little weight.


**[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]**

## CONCLUSION

**WHEREFORE,** the Plan Proponents respectfully request that this Court: (i) overrule the Wachovia Plan Objection, with prejudice; (ii) confirm the Plan; and (iii) grant such other and further relief as the Court deems just and appropriate.

Dated:  Pittsburgh, Pennsylvania
June 9, 2008

**R. TODD NEILSON, CHAPTER 11 TRUSTEE**

/s/ Richard M. Pachulski
**PACHULSKI STANG ZIEHL & JONES LLP**
Richard M. Pachulski
Debra I. Grassgreen
Ilan D. Scharf
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

**OFFICIAL CREDITORS' COMMITTEE**

/s/ David K. Rudov
**RUDOV & STEIN, P.C.**
David K. Rudov
100 First Avenue, Suite 500
Pittsburgh, PA 15222
(412) 281-7300
- and -
**LOWENSTEIN SANDLER PC**
John K. Sherwood
Sharon L. Levine
Thomas A. Pitta
65 Livingston Avenue
Roseland, NJ 07068
(973) 597-2500

***AD HOC* LENDERS' COMMITTEE**

/s/ James G. McLean
**MANION MCDONOUGH & LUCAS P.C.**
James G. McLean
Lou DePaul
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412) 232-0200
- and -
**BROWN RUDNICK LLP**
Robert J. Stark
Jeremy B. Coffey
7 Times Square
New York, NY 10036
(212) 239-4800

***AD HOC*  NOTEHOLDERS' COMMITTEE**

**DUANE MORRIS LLP**
Joel Walker
Jeffrey Spear
600 Grant Street, Suite 5010
Pittsburgh, PA 15219-2811
(412) 497-1000
-and-
**DUANE MORRIS LLP**
William S. Katchen
Suite 1200
744 Broad Street
Newark, NJ 07102-3584
-and-

/s/ Matthew J. Williams
**KRAMER LEVIN NAFTALIS  & FRANKEL LLP**
Thomas Moers Mayer
Matthew J. Williams
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100